UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| UNITED STATES OF AMERICA | Criminal No. 3:12cr40 (JBA) |
|---|---|
| v. | |
| AMAURY VILLA | October 27, 2014 |

**POST-*CURCIO* HEARING RULING**

On July 31, 2014, the Court held a hearing pursuant to *United States v. Curcio*, 680 F.2d 881 (2d Cir. 1982) to examine any potential or actual conflict of interest in Attorney Maria Elena Perez's continued representation of Defendant Amaury Villa arising from Ms. Perez's meeting with co-defendant Yosmany Nunez without the presence of Mr. Nunez's attorney. (*See* Gov't's Mot. for *Curcio* Hr'g [Doc. # 291] at 1.) Subsequently, on September 10, 2014, Ms. Perez moved [Doc. # 330] to withdraw as Mr. Villa's attorney, purportedly "over the objection of Mr. Villa." Ms. Perez has now moved [Doc. # 353] to withdraw her Motion to Withdraw as Counsel, contending that Mr. Villa "is not allowing [her] to withdraw." For the reasons that follow, the Court finds that there is no showing of a conflict of interest—actual or potential—in Ms. Perez's continued representation of Defendant.

**I.     Background**

As the Government set forth in its Motion for a *Curcio* Hearing [Doc. # 291], Mr. Nunez was arrested in the Southern District of Florida on April 17, 2014, and at his April 24, 2014 initial appearance he was represented by Attorney Frank Rubio, who filed a "Notice of Temporary Attorney Appearance." (*See United States v. Nunez*, No. 14mj6117

(BSS) [Doc. # 2], Ex. 2C to Def.'s *Curico* Hr'g Exhibits [Doc. # 327].)  Visitor logs from the Florida detention center where Mr. Nunez was held after his initial appearance show that on the evening of his initial appearance, Ms. Perez visited Mr. Nunez.  (Inmate Visitor Report, Def.'s Hr'g Ex. 6C.)

At the *Curcio* hearing, Mr. Rubio declined to allow his client to testify regarding any details of the meeting with Ms. Perez, invoking Mr. Nunez's Fifth Amendment privilege and claiming a joint-defense privilege between Defendants Nunez and Villa, although no record of a joint defense agreement was offered.  (*Curcio* Hr'g Tr. [Doc. # 309] at 58.)  Ms. Perez represented to the Court that on April 22, 2014, she had a 58 minute telephone conversation with Mr. Rubio (which she substantiated with telephone records (Ex. 1C at 2)), who had just been retained to represent Mr. Nunez at his initial appearance and had not yet determined whether he would represent Mr. Nunez for the remainder of the case.  (*Curcio* Hr'g Tr. at 38.)  Mr. Rubio explained to the Court that he was still negotiating with Mr. Nunez regarding his retention, but he never provided Ms. Perez with permission to speak with his client and even though he had not been fully retained, he "was his counsel that day" and "would have said 'no'" if someone had asked to speak with Mr. Nunez.  (*Id*. at 19, 68–69.)

When the Court asked Ms. Perez whether she disputed that she never sought Mr. Rubio's permission to speak with Mr. Nunez, Ms. Perez responded:  "I am disputing that on some level."  (*Id*. at 38.)  However, she later equivocated, suggesting that she did not seek Mr. Rubio's permission because she believed that his limited representation of Mr. Nunez at the initial appearance on April 24, 2014 had expired after that hearing ended and therefore she did not require his permission when she visited Mr. Nunez later that

2

same day.  (*See id.* at 40 ("[A]t that point it was my understanding that there was no lawyer at that point."); *see also id.* at 21 ("And it was also what—my impression that I was left with at that very time, he was not being represented yet because it hadn't been determined.  It was—based on my conversations with Mr. Rubio, it was for the bond hearing, and the day that I met with Mr. Nunez, the bond hearing had already terminated.").)

To assess any potential that this incident may have created a conflict of interest in Ms. Perez's representation of Mr. Villa, the Court appointed J. Patten Brown as independent counsel to advise Mr. Villa.  Mr. Brown represented to the Court that Mr. Villa told him that he was "not disputing his guilt in this case" and was aware of Mr. Perez's conversation with Mr. Nunez and that it "did not influence his decision in any way in entering into a decision to plead guilty"[1] and that Mr. Villa wished to continue to have Ms. Perez represent him.  (*Id.* at 56–57.)  Ms. Perez stated that she was not seeking to withdraw Mr. Villa's guilty plea.  (*Id.* at 47.)

---

[1] On May 2, 2014, Mr. Villa pled guilty to each count of the Superseding Indictment [Doc. # 86], charging conspiracy to commit theft from an interstate shipment, 18 U.S.C. § 371; three counts of theft from interstate shipment, 18 U.S.C. § 659; and interstate transportation of stolen property, 18 U.S.C. § 2314.  No plea agreement was entered into with the Government.  (*See* Minute Entry [Doc. # 231].)  On April 10, 2014, a Second Superseding Indictment [Doc. # 207] was returned, which contained identical charges against Mr. Villa and also charged for the first time co-Defendants Alexander Marquez, Rafael Lopez, and Mr. Nunez.

## II. Discussion

### A. Disqualification of Counsel in General

The Sixth Amendment to the Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. The accused, however, does not have the absolute right to counsel of her own choosing:

> [W]hile the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers.

*Wheat v. United States*, 486 U.S. 153, 159 (1988). "Similarly, although a criminal defendant can waive her Sixth Amendment rights in some circumstances, that right to waiver is not absolute, since '[f]ederal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them.'" *United States v. Locascio*, 6 F.3d 924, 931 (2d Cir. 1993) (quoting *Wheat*, 486 U.S. at 160). Thus, the "authority of federal courts to disqualify attorneys derives from their inherent power to 'preserve the integrity of the adversary process.'" *Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d 127, 132 (2d Cir. 2005) (quoting *Bd. of Educ. v. Nyquist,* 590 F.2d 1241, 1246 (2d Cir. 1979)).

"The question of disqualification therefore implicates not only the Sixth Amendment right of the accused, but also the interests of the courts in preserving the integrity of the process and the government's interests in ensuring a just verdict and a fair

4

trial." *Locascio*, 6 F.3d at 931. "In deciding a motion for disqualification, the district court recognizes a presumption in favor of the accused's chosen counsel, although this presumption can be overcome by a showing of an actual conflict or potentially serious conflict," *id.*, and courts must "balance 'a client's right freely to choose his counsel' against 'the need to maintain the highest standards of the profession.'" *Hempstead Video*, 409 F.3d at 132 (quoting *Gov't of India v. Cook Indus., Inc.,* 569 F.2d 737, 739 (2d Cir. 1978). "A court is not required to accept a [defendant's] waiver of his lawyer's conflict of interest at the expense of these interests." *United States v. Rivera*, 10-2280-CR, 2014 WL 2958447, at *3 (2d Cir. July 2, 2014).

A district court has "substantial latitude" to disqualify an attorney and there "are many situations in which a district court can determine that disqualification of counsel is necessary. The most typical is where the district court finds a potential or actual conflict in the chosen attorney's representation of the accused, either in a multiple representation situation or because of the counsel's prior representation of a witness or co-defendant. Courts have also considered disqualification where the chosen counsel is implicated in the allegations against the accused and could become an unsworn witness for the accused or where the chosen counsel is somehow unable to serve without unreasonable delay or inconvenience in completing the trial." *Locascio*, 6 F.3d at 931 (internal citations omitted). A disqualification ruling is reviewed for an abuse of discretion. *Id.*

### B. Conflict of Interest

As the Government acknowledged before the *Curcio* hearing, it was "difficult to assess the precise conflicts potentially engendered by the meeting" given that it was not known "the purpose of the meeting, what the participants discussed, or in which

direction(s) the exchange of information flowed."[2] (Gov't's Mot. for Hr'g [Doc. # 291] at 9.) Because the meeting occurred a few weeks before Mr. Villa pled guilty, the Government asked the Court to query whether it had any effect on his decision to plead guilty without a plea agreement. (*Id.* at 10.)

Due to Mr. Nunez's assertion of privilege, there is no record of what was discussed in Ms. Perez's meeting with him. However, at the *Curcio* hearing, Mr. Brown represented that Mr. Villa was aware of Ms. Perez's meeting and that it did not have any effect on his guilty plea. Thus, there is no indication that Ms. Perez's meeting with Mr. Nunez implicated her allegiance to her client's interests such that it "may result in inadequate representation of a defendant," *United States v. Fulton*, 5 F.3d 605, 612 (2d Cir. 1993), or "tend[] to taint" this case, *Hempstead Video,* 409 F.3d at 132. If anything, the record suggests that Ms. Perez was perhaps overzealous in attempting to advocate for her client. Thus, there is no basis to disqualify Ms. Perez on the basis that her meeting with Mr. Nunez created a conflict of interest.

### C. Alleged Ethical Violation

The Government maintains that despite Ms. Perez's professed belief that Mr. Rubio's representation of Mr. Nunez terminated after the initial hearing held on the same day of her visit, the meeting "appears to have been impermissible" and "[e]thical considerations proscribe such conduct." (Gov.'t's Br. at 8.) Specifically, Rule 4.2 of the

---

[2] The Government has not moved for Ms. Perez to be disqualified and only requested "a *Curcio* hearing to determine whether there are any actual or potential conflicts as to the representation of defendants Villa and Nunez." (Gov't's Mot. Hr'g at 10.)

Florida Rules of Professional Conduct and its nearly identical counterpart in Connecticut, which provide that:

> In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer.

While both the Florida and Connecticut rules provide that under certain circumstances an otherwise unrepresented person to whom limited representation is being provided is considered to be unrepresented for purposes of Rule 4.2,[3] Mr. Rubio stated that despite his initial limited appearance on behalf of Mr. Nunez, he considered him a client and would not have allowed anyone to contact him.

---

[3] Florida Rule 4-4.2(b) provides:

> An otherwise unrepresented person to whom limited representation is being provided or has been provided in accordance with Rule Regulating the Florida Bar 4-1.2 is considered to be unrepresented for purposes of this rule unless the opposing lawyer knows of, or has been provided with, a written notice of appearance under which, or a written notice of time period during which, the opposing lawyer is to communicate with the limited representation lawyer as to the subject matter within the limited scope of the representation.

Connecticut Rule 4.2 provides:

> An otherwise unrepresented party for whom a limited appearance has been filed pursuant to Practice Book Section 3-8(b) is considered to be unrepresented for purposes of this Rule as to anything other than the subject matter of the limited appearance. When a limited appearance has been filed for the party, and served on the other lawyer, or the other lawyer is otherwise notified that a limited appearance has been filed or will be filed, that lawyer may directly communicate with the party only about matters outside the scope of the limited appearance without consulting with the party's limited appearance lawyer.

To the extent that there was an ethical breach, the Court has an independent interest "'in preserving the integrity of the process and the government's interests in ensuring a just verdict and a fair trial'" and it is "is not required to accept a [defendant's] waiver of his lawyer's conflict of interest at the expense of these interests." *Rivera*, 2014 WL 2958447, at *3 (quoting *Locascio,* 6 F.3d at 931, citing *United States v. Arrington,* 867 F.2d 122, 128–29 (2d Cir. 1989)). However, "disqualification is only warranted where 'an attorney's conduct tends to taint the underlying trial,' because other ethical violations can be left to federal and state disciplinary mechanisms." *Hempstead Video,* 409 F.3d at 132 (quoting *Nyquist*, 590 F.2d at 1246).

Thus, although "decisions on disqualification motions often benefit from guidance offered by the American Bar Association (ABA) and state disciplinary rules, such rules merely provide general guidance and not every violation of a disciplinary rule will necessarily lead to disqualification." *Id.* Instead, the focus is on violations that "may result in inadequate representation of a defendant." *United States v. Fulton*, 5 F.3d 605, 612 (2d Cir. 1993). For example, in *Wheat*, the relevant ethical consideration, joint representation of co-defendants by a single attorney, overlapped with the court's "institutional interest in the rendition of just verdicts in criminal cases" which also "may be jeopardized by unregulated multiple representation." 486 U.S. at 160.

Given that the Second Circuit has instructed that ethical violations alone do not require disqualification, *see Hempstead Video,* 409 F.3d at 132, and that Mr. Villa has already pled guilty, there is no reason to believe that Ms. Perez's alleged ethical violation will impact this case going forward because this meeting has not been shown to be relevant to issues related to sentencing which is still pending. *See Glueck v. Jonathan*

*Logan, Inc.*, 653 F.2d 746, 748 (2d Cir. 1981) ("Recognizing the serious impact of attorney disqualification on the client's right to select counsel of his choice, we have indicated that such relief should ordinarily be granted only when a violation of the Canons of the Code of Professional Responsibility poses a significant risk of trial taint.").

In post-*Curcio* hearing briefing, the Government suggested that Ms. Perez's potential ethical violations could create a conflict "[t]o the extent that these issues cause Attorney Perez to have a divided loyalty between her self[-]interest in her professional reputation and the interests of Mr. Amaury Villa in zealous representation in this case." (Gov't's Br. [Doc. # 332] at 9.) As an example, the Government cites Ms. Perez's suggestion "that her client could testify about her contacts with Nunez, but indicated that she herself would not testify under oath without first consulting an attorney of her own." (*Id.* at 9.) The Government contends that it "can hardly be in a criminal defendant's interest to be subjected to cross-examination by the Government before sentencing, solely in an effort to deflect criticism of defense counsel's ethical lapses." (*Id.*)

The Government does not cite any specific instance in the hearing regarding Ms. Perez's offer for Mr. Villa to testify, but Ms. Perez only offered to have Mr. Villa testify as to whether her meeting with Mr. Nunez resulted in his guilty plea being involuntary. (*Curcio* Hr'g Tr. at 50.) Through Attorney Brown, Mr. Villa represented that this meeting did not influence his guilty plea. Thus, it is unclear how Ms. Perez's offer subjected Mr. Villa to "cross examination" that would have prejudiced his interests when this offer was made in the context of a *Curcio* hearing that the Government requested and which requires the Court to inquire of the defendant regarding the adequacy of his representation.

Next, the Government's ability to report Ms. Perez's alleged ethical violations to attorney disciplinary authorities could potentially create a conflict of interest, because an attorney who faces a potential disciplinary referral might have an incentive to curry favor with the Government at her client's expense in order to protect her own interests and avoid professional censure.  *See Blake v. United States*, 723 F.3d 870, 881 & n.10 (7th Cir. 2013) (noting that an attorney under criminal investigation by the same U.S. Attorney's Office prosecuting his client might be "incented to pull punches in [his client's] defense" in order to "curry favor" with the prosecutors investigating the attorney but that no such incentive existed when the investigation was transferred to another U.S. Attorney's Office to avoid a potential conflict of interest).

However, the Government made clear at the *Curcio* hearing that it was under an obligation to report these allegations to the Department of Justice's Office of Professional Responsibility ("OPR") and that it would not have discretion regarding referral, explaining that it was "going to have to let OPR know, but we don't actually do any of the reporting or make any decision about" whether OPR will refer an attorney to disciplinary authorities.  (*Curcio* Hr'g Tr. at 65–66); *see also* United States Attorneys' Manual § 1-4.150 ("Allegations of misconduct by non-DOJ attorneys or judges shall be reported to OPR for a determination of whether to report the allegation to appropriate disciplinary officials.").

Because any alleged violations of the Rules of Professional Conduct can be redressed through state and federal attorney disciplinary mechanisms and the alleged violations will not taint these proceedings going forward, the alleged ethical violation is not sufficient grounds to disqualify counsel.

### D. Lack of Candor

Finally, at the conclusion of the *Curcio* hearing in which Ms. Perez gave evasive and shifting explanations for her conduct, the Court asked the parties to provide further briefing on the question of whether an attorney's "ability to represent a client zealously and effectively is impaired if the Court has any misgivings about the candor of counsel to the Court?" (*Curcio* Hr'g Tr. at 75.)  In their post-hearing briefing, neither party could locate any relevant authority although they both acknowledged the Court's general supervisory power over and interest in ensuring just proceedings.  (Gov't's Br. at 10; Def.'s Br. [Doc. # 333] at 3.)

While the Court's "'independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession'" affords it "wide latitude" to disqualify counsel, typically disqualification occurs only "where the district court finds a potential or actual conflict in the chosen attorney's representation of the accused." *Locascio*, 6 F.3d at 931 (quoting *Wheat*, 486 U.S. at 160).  Despite these general principles, the parties have not identified any cases in which a federal court has disqualified retained

criminal counsel on the basis of attorney misconduct or lack of candor to the Court nor is the Court aware of any such cases.[4]

The Supreme Court has explained that the Sixth Amendment does not simply guarantee adequate representation to ensure a fair trial but also the "right to counsel of choice" and "that a particular guarantee of fairness be provided—to wit, that the accused be defended by the counsel he believes to be best." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 146 (2006). Thus, a court's erroneous denial of a criminal defendant's retained counsel of choice requires reversal without a further showing of harm required. *Id.* Even if Ms. Perez's representations to the Court related to the circumstances of her visit with Mr. Nunez could be viewed as lacking candor, Mr. Villa's Sixth Amendment right to retained counsel of his choice predominates and the Court finds no basis for disqualifying Ms. Perez as counsel.

---

[4] While the Court has discretion to deny admission to visiting counsel such as Ms. Perez, the Second Circuit has made a clear distinction between the initial denial of visiting attorney status and the revocation of this status once a case has begun, holding that "revocation of *pro hac vice* status is a form of sanction that cannot be imposed without notice and an opportunity to be heard." *Martens v. Thomann*, 273 F.3d 159, 175 (2d Cir. 2001); *see also United States v. Collins,* 920 F.2d 619, 627 (10th Cir. 1990) (holding that although attorney's past "behavior before other courts provided ample grounds to scrutinize his application for *pro hac vice* admission," "because the district court in exercise of its discretion admitted [the attorney] *pro hac vice,* the court's subsequent revocation of such status must be evaluated as though it had disqualified a regular member of [that district court's] bar"); *Kirkland v. Nat'l Mortgage Network, Inc.,* 884 F.2d 1367, 1372 (11th Cir. 1989) (same).

### III.    Conclusion

For the reasons set forth above, Attorney Perez's Motion [Doc. # 353] to Withdraw the Motion to Withdraw as Defendant's Counsel is GRANTED and the hearing scheduled on that motion is therefore canceled.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 27th day of October, 2014.